UNITED STATES DISTRICT COURT

**FEE PAID**     **S/N/I**     STATE OF CALIFORNIA

**2:23-CV-07430-AB-AGRx**

| | FILED |
|---|---|
| | CLERK, U.S. DISTRICT COURT |
| | SEP - 5 2023 |
| | CENTRAL DISTRICT OF CALIFORNIA |
| | BY: _____ rsm _____ DEPUTY |

MAVERICK MILES                    )
NEHEMIAH,, an individual,    ) COMPLAINT FOR DAMA...
    Plaintiff,                         ) DEFAMATION
vs.                                         ) TORTIOUS INTERFERENCE
ROLLING STONE LLC,           ) WITH CONTRACTUAL
PENSKE MEDIA                      ) RELATIONS
CORPORATION, SUITE57      )
LLC, SEAN WILLIAMS, an      )
individual, MARIA FONTURA,  ) Demand for money over $75,000
an individual, JUDITH R.          )
MARGOLIN, an individual, and )
MONTY ROSS, an individual    )
Defendants                            )
                              )
_____    )

     COMES NOW the Plaintiff MAVERICK MILES NEHEMIAH, In Pro Se to state and allege claims against the above-named Defendants as follows:

**<u>INTRODUCTION</u>**

1. Plaintiff, MAVERICK MILES NEHEMIAH, (herein after "Nehemiah"), appearing pro se, respectfully brings this defamation and tortious interference lawsuit before this Honorable Court against Rolling Stone Magazine, LLC, Penske Media Corporation, Suite57 LLC, Sean Williams, Maria Fontura, Monty Ross, and Judith Margolin alleging intentional and reckless publication of false statements that have caused substantial harm to the Plaintiff's reputation and well-being. This lawsuit seeks to vindicate the Plaintiff's rights and hold the Defendants accountable for their damaging actions.

2. In the age of rapid information dissemination through various media channels, the impact of defamatory statements cannot be underestimated. The power of false statements to tarnish an individual's reputation and livelihood is immense, often causing lasting damage that cannot be easily undone. The Plaintiff, in this case, is a victim of such damaging falsehoods, which have been broadcast to a wide audience, inflicting significant emotional distress and financial loss.

3. The legal basis for this action rests on the principles of defamation law, which recognizes the rights of individuals to protect their reputation from unjust harm caused by false statements. The Plaintiff alleges that the Defendants made false statements with knowledge of their falsity or with reckless disregard for the truth, thereby satisfying the requisite standard for defamation.

4. This lawsuit is brought pursuant to the jurisdiction conferred upon this Court by 28 U.S.C. § 1332(a), as the parties are citizens of different states and a different country, the amount in controversy exceeds the statutory threshold. Additionally, the Plaintiff seeks relief under the applicable state defamation statutes as well as the First Amendment of the United States Constitution.

5. The Plaintiff's claim is trifold: first, to establish the Defendant's liability for defamation, and second, to seek appropriate remedies, including compensatory and punitive damages, to rectify the harm caused by the defamatory statements. Lastly to show that defendants tortiously interfered with the contractual obligations of the plaintiff . The Plaintiff is prepared to present evidence demonstrating the falsity of the statements, the Defendants culpable states of mind, the extent of the harm suffered, and the resulting damages.

6. In bringing this pro se action, the Plaintiff acknowledges the complexities of the legal process but remains steadfast in the pursuit of justice. The Plaintiff is committed to presenting the case diligently, respectfully, and in accordance with the rules of this Court.

7. This Court's intervention is sought to redress the grave harm inflicted upon the Plaintiff and to affirm the importance of truth and accuracy in public discourse. The Plaintiff trusts in the equitable nature of this Court to consider the evidence, the law, and the principles of fairness in rendering judgment.

8. WHEREFORE, Maverick Miles Nehemiah, the Plaintiff respectfully requests that this Honorable Court grant the relief sought, including but not limited to compensatory and punitive damages, and such further relief as the Court deems just and proper.


## **PARTIES & JURISDICTION**

1. The plaintiff is an individual who resides in Los Angeles, California. Upon information and belief Defendants reside in New York, New York, Atlanta, Georgia, and Wellington New Zealand. Plaintiff is informed and believes based on such information that the locations of residency for the named defendants are true and correct.

2. This court has jurisdiction pursuant to 28 U.S. Code Section 1332 (a) (1) as there exists diversity jurisdiction and that the action in controversy exceeds the sum or value $75,000, exclusive, of interest and costs.

3. Venue is proper because the Plaintiff resides in California and Defendants reside in New York, Georgia, and the country of New Zealand.

## FACTUAL SUMMARY

1. On or about August 1st of 2022, Nehemiah was in contact with Sean Williams(Wiliams) who was commissioned by Rolling Stone Magazine to write a feature subject article on Nehemiah's life story including his fantastical crime story from his biography "*The Confidence Chronicles" The Greatest Crime Story Never Told*, for Rolling Stone magazine.  Williams, who had been interested in telling the life story of Nehemiah, had communications with Nehemiah about coming to Atlanta to get an in person and better telling of his life story in the location that many of the events of the past took place. Nehemiah resides in Los Angeles, California and was deceptively led to believe by Williams that he would need to come to Atlanta versus Los Angeles due to the recommendations of Williams' editor Maria Fontura.  Nehemiah would find out later through evidence of the actual email communications of Williams and Fontura, that this was not the case, rather the preference of Williams in an attempt to cut his own personal travel expenses. Nehemiah took on extensive costs to travel across the country to meet Williams driving the 2,175 miles by himself from Los Angeles, Ca. to Atlanta, Ga on or about October 20th, 2022. Rolling Stone magazine didn't give Nehemiah a travel stipend, or cover any of his travel expenses, cost or even per diem.

2. Nehemiah spent extensive amounts of time together with Williams over the course of approximately one week in Atlanta, Georgia at his own expense chauffeuring him around town, detailing the different aspects of the historical criminality, and aiding him in having sufficient material that he needed to write the story that he had secured the commission from Rolling Stone magazine.  After driving back to California and returning home to Los Angeles, Nehemiah provided an extensive list of his contacts, friends, family and colleagues to Williams so that he could have sufficient material to write the story with extensive background of Nehemiah's life.

3. After much time (four [4] months) had lapsed, on or about February 1st of 2023, Nehemiah had been in contact with Williams in regards to his life story that he was writing for Rolling Stone magazine. Williams had been in sporadic contact with Nehemiah, but that contact had lessened and he wanted to touch base with Williams as to the timeline of the story appearing in Rolling Stone Magazine as Williams had provided many earlier completion dates with no updates after those times had lapsed.  Williams at this point of February 6th 2023, had forwarded Nehemiah an eighteen (18) page rough (2nd) draft of the piece for him to be able to take a look at before final touches were to be made before submission to Rolling Stone so that editorial changes could be made and fact checking could be completed.

4. After March 1st 2023, Nehemiah had begun receiving calls from family and friends about Williams unprofessionally contacting them and acting very "pushy and rude" and were looking for confirmation from Nehemiah that Williams was someone that they could trust and could feel comfortable revealing information about his life story.  Nehemiah at that

time had no suspicions of Williams true malicious intentions and of course assured his friends and family that he had in fact been working with Rolling Stone magazine and Williams on the feature story and they could feel comfortable speaking with Williams about his life.

5.   In April of 2023 Nehemiah's long time friend, "Leo", of over 25 years had contacted him with grave concerns about Williams and the information that he had been asking him to do.  Leo had informed Nehemiah that Williams was asking him many inappropriate questions that deviated from the original story that Williams had proposed and had sent to Nehemiah for his approval.  Williams had informed Leo that the story Nehemiah was expecting him to write was not going to be anything close to the rough draft that had been proposed and sent in February 2023 to Nehemiah for his review and approval.  Williams would deceptively and unethically go so far as to ask Leo to secretly record conversations with Nehemiah acting as a "confidential informant" for Williams and Rolling Stone LLC. Williams was telling and even texting Leo *"that I'll gladly keep you out of the story"* and that any information that Leo would possibly recover would simply be considered hearsay without a secret audio recording.

6.   After Leo had contacted Nehemiah with these current deceptive revelations, it took multiple hours over the course of several days for Nehemiah to calm Leo down and to try and repair the 25 year friendship of the lies that Williams had been very compelling and forceful in spreading the cadre of lies, half truths and wild rumors to him.

7.   Leo had detailed to Nehemiah that Williams, who he had previously been in contact with Leo before as a story source under that agreed condition of anonymity, had contacted him again and acted like he didn't know who Leo was.  Williams began calling him by his "government name" not the  name he provided  when he was previously detailing information about Nehemiah for the article. Saying to Leo: *"I know who you are!"*

8.   Williams had informed Leo that Nehemiah was not "who he thought he was" and how he was going to shed light on all of the horrible acts that Nehemiah was a part of and blindside him with the article, expose him and "take him down so that everybody can find him".

9.   After Williams had "enlightened" Leo, he enlisted Leo for his "clandestine & secret confidential" help in recovering further information and intel via Nehemiah himself. Williams provided Leo with a list of questions that he was going to need Leo to ask Nehemiah.

10.  After detailing what the questions would be, Williams went a step further to offer Leo money and that he would do a story on Leo's life as well. Williams was so pushy and demanded that Leo record the conversation that he was planning on having with Nehemiah to ensure that the information that he provided would be legit and *"would go a long way with his editor"*, Maria Fountura, who Williams wanted to play the recordings for along with Rolling Stone magazine. Williams informed Leo and went on to say: "without the recordings, his answers to the questions would be just considered hearsay."

11. Leo, being a long time friend (over 25 years) with Nehemiah, informed Nehemiah of the highly unethical, and malicious underhanded dealings of Williams to set Nehemiah up to take a cooked up fall. Williams had asked Leo to record and participate in the journalistic espionage to take down Nehemiah.

12. Leo, still confused as to the questions that Williams had presented to him, reached out to Maria Fontura at Rolling Stone magazine to gain further clarification of Williams working for Rolling Stone magazine and the tasks that Williams had sanctioned and set forth for him to do.  Fontura confirmed with Leo via email that Williams did in fact work for Rolling Stone magazine, and that Williams had been asked to do a story about Nehemiah for Rolling Stone magazine.  Leo sent an email correspondence on May 18th 2023, to Fontura looking for his financial compensation for these "recorded phone calls" offering to meet with Fontura to discuss things further when Leo was in New York City for other business. It was at this point that Leo would receive an automated email response that Maria Fontura no longer worked for Rolling Stone magazine and that her last day with Rolling Stone would be: *"Please note that Friday, May 19 will be my last day with Rolling Stone".* Which was the very next day. Leo was shocked by the sudden and unceremonious departure of Executive Editor Maria Fountura.

13. Nehemiah was also very concerned after speaking with Leo about the goings on of what Williams was asking of Leo and also reached out to Maria Fontura to gain further clarification.  Nehemiah gave extensive details in his email to Fontura of the unethical borderline criminality of journalistic practices of Sean Williams.  Nehemiah also received information via Rolling Stones email server that Fontura was no longer working for Rolling Stone magazine.

14. Shortly after receiving information from Rolling Stone that Fontura was no longer working for Rolling Stone magazine, Judith Margolin replied to Nehemiah's email stating that Fontura was no longer an employee with Rolling Stone.

15. Nehemiah informed Margolin with extensive email correspondence including all the digital evidence of the behaviors that Williams was displaying in regards to the telling of his highly fabricated agenda driven story including correspondence that Williams had with Leo along with other factual compelling evidence of great concern.  Nehemiah even supplied Margolin with the postings of Williams digging for more information on tabloid-like, unverifiable web pages such as the "ripoffreport.com" desperately leaving Williams' phone number for anyone to contact him with more salacious information about Nehemiah.  Margolin, who had stated that she had not seen or received Nehemiah's emails that he had sent to Fountura but simply informed Nehemiah that she would look into and investigate the matter.

16. Sometime after about a month of waiting to hear back on Margolin's findings of her investigation. About the first week of June 2023, Margolin replied back to Nehemiah indicating that she "found no evidence of wrongdoing" from Williams' journalistic

tactics.  Nehemiah could not have anticipated such a response from Margolin as he had provided ample concrete proof in the opposition.

17. Nehemiah served Margolin with multiple cease and desist letters throughout June and July 2023 with no response from Margolin or Rolling Stone LLC in regards to those cease and desist demands.

## FIRST CAUSE OF ACTION FOR DEFAMATION FOR ALL DEFENDANTS

1. Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 17, inclusive, as though fully set forth herein.

2. Defendants Williams, Margolin, Ross, Penske Media Corporation, and Rolling Stone LLC are all equally responsible for defamation.

3. On or about February of 2023 through August of 2023, defendant Williams made numerous false and damaging statements about the Plaintiff to many of his friends and family members, claiming that the Plaintiff had engaged in prostitution rings, crimes that included being involved with a car theft ring with the Russian Mafia, stolen vehicles and participation in luring women into the sex trade via Craigslist. These statements were both false and highly defamatory, and it was made with the requisite degree of fault, malice, and negligence on the part of the Defendant.

4. A defamatory statement is one that tends to harm the reputation of another individual. In this case, the Defendant's statements that the Plaintiff engaged in prostitution rings, crimes that included car theft with the Russian Mafia, stolen vehicles and participation in luring women into the sex trade via Craigslist are clearly defamatory as it impugns the Plaintiff's character and reputation.

5. The defamatory statement must be "of and concerning" the Plaintiff. The statement need not explicitly mention the Plaintiff's name, but it must be reasonably understood to refer to the Plaintiff. The Defendant's statement made to Nehemiah's friends, family and colleagues sufficiently identifies the Plaintiff as the subject of the statements. To establish defamation, the defamatory statement must have been communicated to a third party. The statement made by the Defendant to Nehemiah's friends, family and colleagues  satisfies the publication element, as it was communicated to a person other than the Plaintiff.

6. Slander requires a lower degree of fault than libel. In this case, the Defendant's statement was made negligently, as the Defendant failed to exercise reasonable care in verifying the accuracy of the statement before making it to Nehemiah's friends, family and colleagues

7. *Taus v. Loftus, 40 Cal. 4th 683 (2007)* The California Supreme Court held that a defendant who repeats defamatory statements, even if true, may be liable for defamation if they do so with "malice," meaning reckless disregard for the truth. This case highlights the importance of the defendant's state of mind in defamation cases.  Williams obtained information about Nehemiah from salacious tabloid-like webpages and passed along the information as truth to Nehemiah's friends, relatives and colleagues without ever fact checking information.  Williams used the same tabloid-like information to defame and

destroy the contractual relationships that Nehemiah had with Monty Ross for a Hollywood movie deal. Williams did all this with malicious intent with reckless disregard for the truth.

8. Defendants Rolling Stone LLC, Penske Media Corporation, Fontura and Margolin were made aware of the conduct and behaviors of Williams and the heinous journalism practices that he undertook to ruin Nehemiah for his own selfish gains. Rolling Stone LLC, Penske Media Corporation, Fontura and Margolin did nothing to halt the unethical practices of Williams with reckless disregard for the truth.

9. Defendants Rolling Stone LLC, Penske Media Corporation, Fontura and Margolin failed to rein in their rogue journalist even after they were made aware of his unethical practices. The defendants' concern lied more in the telling of a "good story" in their eyes versus telling the true story.

10. The Defendant's false statements, as alleged, fall within the category of slander per se, as they impute a lack of fitness in Plaintiff's profession or business. Furthermore, based on the case law presented, the repetition of the false statements by the Defendant may establish "malice" and recklessness. The false statements being slander per se alleviate the Plaintiff's burden of proving specific harm.


### SECOND CAUSE OF ACTION FOR TORTIOUS INTERFERENCE FOR DEFENDANTS SEAN WILLIAMS AND MONTY ROSS

1. Plaintiff incorporated herein by reference the allegations made in paragraphs 1 through 17, inclusive, as though fully set forth herein.

2. The Defendants engaged in a pattern and practice of tortious interference against Plaintiff Nehemiah, in that during the course of their relationship with Nehemiah, Defendant Williams intentionally interfered with the contractual obligations that Nehemiah had been procuring with Suite57 LLC, and Monty Ross. Defendant Ross who had entered into a contract with Nehemiah transformed his contractual obligations to Nehemiah after Williams had interfered and convinced Ross that it would be more lucrative to work with Williams in the alternative story that he was crafting for publication with Rolling Stone LLC. Defendant Williams had knowledge of the contractual dealings of Nehemiah, Suite57 LLC and Ross first hand from Nehemiah. Once aware of these obligations, Williams began to interfere with the relationship that Nehemiah had with Ross in an attempt to harm, disrupt and terminate the relationship with Nehemiah and Ross. Once the interference from Williams had begun, the contractual obligations that were set up with Ross were abandoned by Ross with no explanation to Nehemiah other than a cryptic text on Wednesday, March 29th 2023 at 9:02 AM, saying: *"My good man. The script is yours."* Further adding: *"As I see it, there's nothing more I can contribute to this."* Ross went on to say: *"This is your project. Peace".*

3. In California, a claim of tortious interference requires the plaintiff to demonstrate the following elements: existence of a valid contract or economic relationship. The plaintiff must establish the existence of a valid contractual or economic relationship between themselves and a third party. Nehemiah, Suite57 LLC and Ross had entered into a written contract to tell the life story of Nehemiah on the Hollywood screen.

4. Second, there must have been knowledge of the relationship. The defendant must have knowledge of the existence of the plaintiff's contractual or economic relationship with the third party. In having full transparency with Williams, Nehemiah informed Williams of the relationship between himself and Ross and the impending deal of a movie and the development of a screenplay for the telling of his life story on the Hollywood screen.

5. Next, there had to be intentional interference. The plaintiff must show that the defendant intentionally engaged in conduct designed to disrupt, terminate, or harm the plaintiff's relationship with the third party. Once Williams had been made aware of the monetary gains potential that Nehemiah had with his life story being made into a screenplay for production on the Hollywood screen, he decided to cut Nehemiah out of the equation and persuade Ross to partner with him instead. The plaintiff must also establish a causal connection between the defendant's intentional interference and the damage or harm suffered by the plaintiff as a result. Due to the manipulation and convincing from Williams to Ross (and others), Nehemiah lost the contractual opportunities and monies associated with having his life story on the Hollywood screen as well and anything that might come as a result from that type of publicity.

6. Lastly, the plaintiff must prove damages. Actual damages, such as financial loss or harm to the plaintiff's economic interests, must be proven. Damages can include lost profits, business opportunities, or other economic benefits. Williams tortiously interfered with Nehmiah's contractual opportunities with Suite57 LLC and Monty Ross for his own monetary gains. In doing so, Williams manipulated Ross into having Nehemiah exiled from the equation causing financial harm to Nehemiah. The profits that would come from the Hollywood screen can be astronomical and Williams could not imagine Nehemiah reaping the benefits from his own life story. Williams took it upon himself to create a new team that would work on the life story of Nehemiah interfering with his future profits, business opportunities or other economic benefits.

7. As a result of the Defendants' tortious interference conduct, Plaintiff has suffered compensatory, general and special damages in an amount according to proof. Additionally, the Defendants acted with malice, fraud and/or oppression and, thus, Plaintiff is entitled to a significant award of punitive damages.

<u>**THIRD CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF**</u>
<u>**EMOTIONAL DISTRESS  FOR ALL DEFENDANTS**</u>

1. Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 17 inclusive, as though fully set forth herein.
2. The Defendants acts and or omissions were done intentionally and/or with gross indifference to plaintiff rights.
3. Plaintiff was damaged as a direct and proximate result of the action of the Defendants and or its agents.
4. Plaintiff was damaged as a direct and proximate result of the action of the Defendants, and its agents. Plaintiff's emotional distress includes, but is not limited to, extreme humiliation, anxiety and loss of sleep.  As a result of the Defendants' fraudulent conduct, Plaintiff has suffered compensatory, general and special damages in an amount according to proof.  Additionally, the Defendants acted with malice, fraud and/or oppression and, thus, Plaintiff is entitled to an award of punitive damages.


A. <u>**Extreme and Outrageous Conduct**</u>
1. Fletcher v. Western National Life Ins. Co. (1970) 10 Cal. App. 3d 376.  In Fletcher, the court held that outrageous conduct causing severe emotional distress is actionable, even if physical harm was not inflicted. The court emphasized that the conduct must be so extreme that it goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.  Williams contacted over one hundred of Nehemiah's close friends and colleagues alleging that Nehemiah had over nine  children that he was neglecting, he was running a prostitution ring and went even as far as to say that Nehemiah's claims to being adopted was a lie his entire life.  Nehemiah's reputation with friends and family has been tarnished in a way that is completely unrecoverable.
2. Christensen v. Superior Court (1991) 54 Cal. 3d 868. In Christensen, the California Supreme Court clarified that the severity of the emotional distress suffered by the plaintiff is a critical factor in intentional infliction of emotional distress claims. The court held that mild emotional distress or annoyance is insufficient to sustain a claim, and the distress must be of such substantial quantity or enduring quality that no reasonable person should be expected to bear it.  Under the supervision of Maria Fountura and Judith Margolin, Williams made it his mission to contact Nehemiah's friends, family and colleagues in order to spread salacious lies that he had fabricated for his own benefit. Williams planted seeds of deceit and manipulation in an effort to ruin Nehemiah with every person in his life.  Williams' lies and manipulation also ruined the Hollywood screen contract that Nehemiah had procured with Suite57 LLC and Ross.  Hollywood screen films have the potential of making millions of dollars.  Williams robbed Nehemiah of the extreme amounts of money that he was very likely to make with Suite57 LLC, and

Ross.  Nehemiah was deceived, swindled, and bamboozled into thinking that Williams
was writing a story about his life that would be highly favorable.  Instead, Williams was
willing to completely alienate Nehemiah from all of his friends, family and colleagues for
his own selfish monetary gains.


B. **Severe Emotional Distress**

1. Nehemiah has been through a great deal of emotional distress, physical distress and
heartache including, insomnia, loss of appetite, depression, anguish, headaches, and
anxiety from slanderous pursuits of Sean Williams and the neglectful behaviors of Judith
Margolin.  *See, e.g., Potter v. Firestone Tire & Rubber Co., 893 F. Supp. 666 (D. Md.
1993).*  The Courts of this State have held that severe emotional distress "means any
emotional or mental disorder, such as chronic depression, or any other type of severe and
disabling emotional or mental condition which may be generally recognized and
diagnosed by a medical professional.
2. The actions of the Defendants have caused Nehemiah to feel less than human.  He feels
like the relationships that he has maintained his entire life both professionally and
personally have been tainted in a way that is beyond recovery.  Losing the ability to
maintain family relationships and business relationships has been severely damaging to
his physical, mental and emotional well being.


3. Rolling Stone LLC, Penske Media Corporation, Suite57 LLC, Maria Fountura, Sean
Williams, and Monty Ross all intentionally inflicted emotional distress, emotional pain
and suffering; thanks to the defendants' actions, mental anguish, frustration, and anxiety
over the fact that Nehemiah was and remains seriously injured as a result of their
malicious and unethical behaviors.  As a direct and proximate result of the defendants
malice, negligence and journalistic recklessness Nehemiah has suffered permanent
damage to his reputation, business opportunities, mental and emotional distress, insomnia
and anxiety, among other concerns.


4. Nehemiah suffers from great emotional pain intentionally inflicted by Rolling Stone
LLC, Penske Media Corporation, Suite57 LLC, Maria Fountura, Judith Margolin, Sean
Williams, and Monty Ross' unethical actions, including the mental anguish, frustration,
and anxiety over the fact that Nehemiah was and remains seriously and irrevocably
injured.
As a result of the intentional malicious actions, the spreading of salacious rumors, half
truths and lies, the carelessness and negligence of the defendants, has resulted in
Nehemiah having, and will continue to have in the future, the incurrence of expenses as a
result of his psychological trauma, physicians, psychological therapy, and other related
expenses as a result of his mental, emotional, and psychological injuries.

## **PRAYER FOR RELIEF**

1. Wherefore, Plaintiff prays for judgment against the Defendants and each of them, jointly and severally, as follows:

2. An award of one hundred (100) $100,000,000 million dollars of compensatory damages to compensate Plaintiff for the harm caused to his reputation and business.

3. An injunction preventing the Defendants from making any further false statements about the Plaintiff.

4. Plaintiff requests a jury trial.

5. Interest calculated at the maximum amount allowable by law, including pre-and post-judgment interest.

6. Reasonable attorney's fee as allowed by law.

7. For reasonable costs of suit and such other and further relief as the Court deems proper.

Dated this day, September 5, 2023.

Maverick Miles Nehemiah, In Pro Se

Maverick Nehemiah
8306 Wilshire Blvd. Suite 278
Beverly Hills, California 90211
213.260.5297

May 12, 2023

Maria Fontoura
1290 6th Ave
New York, New York 10104
212.484.1616

**RE:** Cease & Desist of The Maverick Nehemiah

Greetings Ms. Maria Fontoura:

It has come to my attention that a freelance journalist, Sean Williams(Williams), who has been commissioned by you, and Rolling Stone magazine to write an article about me has now deceptively deviated from what was presented to me in the pitching of a story about my life.
Originally Williams had informed me that he would be penning a story about my past story of a US Savings Bond counterfeiting caper that I committed back in the 1980's.
Williams even sent me a copy of his 2nd Draft of his 18 page story. *(I have attached the 2nd Draft of that story that he sent to me back in February for your review)*
It has also come to my attention through many family and friends that Williams has harassed them, stalked them, lied to them about me, slandered me to them and used deceit and trickery to entice me into thinking he was writing one story...
when it was a whole different story entirely that he was after.

Page 1 of 6

Right from the start some 7 months ago, Williams knowingly lied to me about you and Rolling Stone magazine requesting for me to travel cross country from my home in Los Angeles to accompany him in Atlanta.
Williams said to me that it was your suggestion, Ms. Fontoura, to solicit me to see if I would be willing to meet him in Atlanta.
A suggestion (a lie) that I took great personal travel expenses of gas, hotel, food, and time to drive cross country alone, by myself from California to Georgia and back to California, a total of over 6,000 miles of driving to accommodate this manipulation / lie of Williams.
A lie that he used to lure me to Atlanta that was solely his idea alone and not that of you or Rolling Stone magazine.
If I had known the truth, I would have never gone down to Atlanta to meet with him, most especially at my own out of pocket expenses in the thousands of dollars.
It is this genesis lie that he leveraged to seduce you into giving him this story commission that was used to sell you on the idea that I was
*"raring to go"* to come to meet him, when in actuality Williams was only looking to make it easy on himself to get from London to Atlanta, as opposed to travel from London to Los Angeles. Here's the actual email to refresh your recollection of these salient events Ms. Fountura:

**From:** Sean Williams <seanwilliams85@protonmail.com>

**Sent:** Tuesday, July 26, 2022 11:31 AM

**To:** Maria Fontoura <mfontoura@rollingstone.com>

**Subject:** Re: Story - Maverick and the All-American Bank Scammers

Hi Maria,

I spoke to Maverick today, here's what we discussed about the story:

Re logistics, he'd love to meet me in Atlanta, and take me on a week in the city, showing me where he assembled the all-American team, and some of the banks they hit along the way— he suggested Birmingham AL and Chattanooga TN as a couple of roadtrips we could make. This makes my travel situation pretty simple as Atlanta's so easy to get to.

Two members of his team are willing to speak with me, plus the paper mill owner who apparently didn't only sell to Maverick for scams back in the day (!). As for his case details, he's unsure whether we can unseal them—but he has spoken to his former case officer and a former US district attorney who prosecuted the case who can speak to me on background and give me more information.

He wouldn't be ready to do anything until September earliest as he's built a custom Porsche for the Monterey Car Week, but he's raring to go and so am I. Do you want to talk this week to discuss more? I'll also be in NYC next month between 20-25 in case you'd like to meet for coffee?

**Page 2 of 6**

Best,

Sean

Williams in his overreaching effort to spread dirt on me actually sent your private email communications with him out to people he was trying to convince of his being legitimately in association with Rolling Stone magazine.

In light of all of this mess, and Williams' questionable judgement, he has a long "dirty laundry" list of unethical journalism practices with the commission that you granted him, Ms. Fountura. Setting the stage for a complete journalistic failure that Rolling Stone and Williams clearly have an agenda, and are recklessly obvious to the harm that has been caused already in Williams ruthless pursuit of that agenda.

Williams is not making any attempt to reach out to me, or contact me to fact check or debunk the bile that he has found about myself on Ripoff Report.

He has even gone so far as asking friends of mine to secretly record conversations with me of a list of questions that Williams provided to my friends so that he might (secretly) gather further information. Saying to my friend: *"It would go a long way with my Editor"*...

Williams wanted my friends to record me secretly for him to play these recordings for you Ms. Fontoura.

Going on to say: "otherwise, it would just be hearsay".

*(I have attached screenshots from Williams to one of my friends that is proof positive of his unethical underhanded tactics and lack of any journalistic integrity whatsoever. Just remarkable how low this man will go to fabricate his twisted story.)*


Additionally, he has solicited fabricated information from the notoriously unreliable salacious www.ripoffreport.com forums looking for anyone who is willing to give information.

https://www.ripoffreport.com/reports/maverick-marsalis/california/maverick-marsalis-porche-company-title-the-pimp-california-california-1103657.

(this is the thread Mr. Williams crafted on www.ripoffreport.com *"porsche-company-title-the-pimp-california"* that thread he created can never be removed.) That's how low down and totally unethical Mr. Williams has lowered himself to besmirch and smeer me.

I can't help but wonder, are these the kind of tactics that Rolling Stone uses to secretly record featured subjects and employ these kinds of rouge journalistic practices liberally and clandestinely? Is this what Rolling Stone magazine does and wants to do to me now, Ms. Fountura? It's just astonishing that Williams would literally put his name, and actual phone number onto this unsavory salacious and notorious forum that purports to be a consumer review site but profits from extortive business practices.

So much so that a federal court has stated that victims of the Ripoff Report have: *"probable cause to sue for extortion and racketeering".*

For Williams to attach himself and Rolling Stone magazine to this libellous and slanderous website is not just legally problematic for you Ms. Fountura, it is incredibly ignorant and devoid of any modicum of sound journalistic wisdom, judgement, and moderation.

Interestingly, Williams never asked me any questions to confirm the information with me as to the truth of these fabricated posts.

*(further indication of his hidden agendas and unethical practices)*

Yet he has gone to such great lengths to interview (so he claims) over one hundred of my friends and

Page 3 of 6

family spreading these defaming and slandering lies for his "story" which clearly he's doing a hit piece secretly to blind side and defame me with and drag me through the mud at his own driven agenda. Never asking me not even one single question as to the veracity of these allegations or even bothering to fact check any aspect of these details whatsoever with me.

In fact, for the past 8 weeks he's been telling me he's going to call me but he hasn't spoken to me directly in a phone conversation in over two (2) months.

(all of this is highly documented via my What'sApp wri:en and recorded communica;ons with Mr. Sean Williams)


Ms. Fontoura, I want you to know that I do not give Sean Williams or Rolling Stone magazine permission to publish any information about my life story.

Furthermore, I do not give permission to Sean Williams or Rolling Stone magazine to publish any photographs that I might have shared unknowingly with Williams.

In addition, be very clear that I have signed no life story rights over to him or any kind of life story releases to Mr. Sean Williams whatsoever.

As such, I demand that you cease and desist your ~~story~~ with Sean Williams, and from continuing with his clandestine defamatory investigation, and very unethical journalistic practices. All of which border on criminality at the highest level of unethical journalistic espionage for your contractual commission from Rolling Stone magazine.

This from a rogue Journalist, a self confessed (to me) former Heroin drug addict, who does not have a scintilla of journalistic integrity whatsoever in how he has procured this "hit piece" story that he is currently crafting for you and Rolling Stone magazine.


Mind you, these are not loose change allegations Ms. Fontoura, these are 100% true facts that are accompanied here by emails, and text screenshots directly from Williams as verified proof for your discretion and assessment.

Not to mention I have several witnesses who are willing to testify as to how they have been harrassed and solicited by Williams.

It's just sloppy (tabloid) journalism.

Clear and cut if you can even dare to call his pure dreck such.

Furthermore, I forbid Mr. Williams or Rolling Stone magazine from publishing any articles about myself or my life story forthwith immediately.

In the instant event, within the moments of your receipt of this letter.


I have been in consultation with my legal team for 3 weeks now as we have gathered all of these facts and essential documented proof

(please see the attachments) about Williams' unsavory rogue journalism and business practices at the bequest of your Rolling Stone magazine commission contract that you issued to him.


I regrettably hate to send you this Cease and Desist Demand letter Ms. Fontoura. I've had my legal team research you and your unblemished journalistic history. I truly believe this is not the way that you do things and that you're an Editor and Journalist of the highest level of integrity and ethical order.


But Williams on the other hand, has been caught dead to rights with the compelling proof of asking a confidential source to secretly record me for Williams' benefit that is attached to this email.

**Page 4 of 6**

confidential source to secretly record me for Williams' benefit that is attached to this email. His unsavory tactics, journalistic unprofessionalism, and salacious manner in how he crafts his stories leaves little to reason about his lack of integrity, rogue journalism and ethical credibility.


Astonishingly, two weeks ago, Williams went so far criminally, and gave out the private number of my companion to a bitter, deranged, mentally unstable and desperate ex-girlfriend who Williams put up to having a most vindictive conversation with my confidante.

All kinds of dirty and slanderous information.

As well as that Williams would be calling moments after this most cryptic, derogatory and inflamed "conversation" rife of inquiries.

And wouldn't you know it Williams did call. (see the attached screenshots)


He's called several of my friends with this exact same number service.

Williams, in his "journalistic espionage" gathered all his intel and started spreading his lies all over the network of my friends and family. Doing all of this "journalistic criminality" with malicious vindictive and damaging intent.

Going so far as to even violate the privacy and safety of a single mother by giving out her private phone number to this mentally fragile, and unstable ex-girlfriend (*Renee Potochan*), Williams used that mentally ill woman to ply his own personal journalistic agenda, to forward his scheme and attempt to ruin what is left of my life.

A huge violation of the stated rules of Journalistic conduct.

Williams freely went undercover and has employed surreptitious methods of gathering inflammatory and questionable unverified information with his hidden agenda story.

Frankly, Williams does not have *carte blanche* to be out here under reputation cover of Rolling Stone magazines authority to have license to break the law or violate the essential rules of conduct that protect people's privacy.

Regardless of the story you commissioned him to do, Williams needed to follow the rules and not, for instance, trespass and violate privacy laws and privacy statutes.

***It is clear that Williams has crossed that (integrity) line and in doing so he has now become a tremendous legal liability for you and Rolling Stone magazine.***

Crossing the line of journalistic integrity, and in crossing that line Williams has now become a criminal. A criminal himself, a criminal with a pen, computer keyboard, telephone, What'sApp where **<u>EVERYTHING</u>** is documented.

In his poor unsupervised judgement, he crossed that line with malice and intention to do great harm, irrevocably damaging harm to both personal and business relationships of mine with several close friends and family. (*I have a recording of Williams stating so himself*)

Why would any real professional Journalist of any ethical integrity conduct themselves in the fashion that Williams has Ms. Fountura?

I'm now giving you an opportunity to take this off ramp from this perilous legal highway that you and Rolling Stone magazine are traveling down with Williams.

Should you elect to not exit here, I will pursue litigation to the fullest extent of the law so that this type of thing does not happen again.

In closing, I urge you to Cease and Desist immediately with any story or activity associated with Williams about my life story.

Page 5 of 6

Because of his well documented clandestine and unscruplious behavior over the past seven (7) seven months it is very safe to say that Williams has no journalistic integrity.

He has no ethical credibility and I don't wish him to be associated with my life story in any capacity whatsoever Ms. Fountura.

If no action is taken by you to cease and desist within the given time frame, I will have no choice but to take appropriate legal action against you, Williams and Rolling Stone magazine. As an advance heads up, I want to give you notification now that you will be hearing from one of the members of my legal counsel today.

Thank you for your time and attention on this most urgent and egregious matter Ms. Fountura. Very Truly,

~Maverick Miles Nehemiah

PS:

These attached files are just a small example of the cadre of very compelling evidence that I and my legal team have compiled on your Journalist Mr. Sean Williams and some of his scandalous unethical tactics.

I also have several recordings of Williams in action, where you can clearly hear his voice and these recordings will surely be very damning if they are ever played at a Deposition or in a court of law.

**Page 6 of 6**

Almost as soon as he answered the phone, Maverick knew the game was up. It was a Friday evening in early February, 1989—four years since Maverick had perfected the art of counterfeiting U.S. Treasury bonds, and three since he'd enlisted the help of six "All-Americans" to "walk paper", or cash them, all over the country. From the off Maverick had called every shot: where the team met, what they wore, which banks they hit. Smalltalk was done face-to-face; pleasantries on private jets and Caribbean beaches.

Yet here was Delilah going off-script, reminiscing on old jobs and asking him how he was. It stunk.

"Where do you want to meet up," Delilah asked Maverick. "Are you in Atlanta?"

He ignored her. Members of the team *never* asked that. "What are you doing," he said.

"I just thought we'd meet up at The Varsity," she replied, mentioning a half-century-old burger joint that was one of the team's favorite pow-wow spots.

"Yeah," Maverick told her. "The Varsity is fine."

Then he hung up. Maverick had worried about Delilah for a while. She drank heavily, and pleaded with him to hit more banks, make more cash. As he stood half-frozen, staring at the wall of his Beverly Hills condo, he feared she'd committed the caper's cardinal sin: walk paper in the same joint twice. He could picture the scene: A suspicious teller. Cops. An interview-room deal. A monitored call.

Feigning credulity would at least buy Maverick time. "I just went along with it," he said, 32 years later. "Because I absolutely knew that somebody was listening in on that call."

Maverick told his girlfriend to pack for a surprise weekend break. Then he stuffed a yellow scuba bag with $9 million of counterfeit bonds, and slung it in the trunk of his quartz-gray Porsche 928S. They were headed an hour north to the Ojai Valley Spa in Ventura County, Maverick told her—but he'd have to make a quick pitstop at U.C.L.A. Medical Center. From past janitorial work he knew there'd be an incinerator onsite. Two hours after Delilah's call Maverick was emptying the scuba bag into it: two years of meticulous work—his *art*—destroyed in seconds.

Later, while staff pampered his girlfriend, Maverick tried to comprehend the trouble he was in. It was only a matter of time before Delilah gave cops the information they needed to arrest him and the rest of the All-American Team. When that happened, he'd be staring at a 50-year stretch—long enough to die behind bars. For years, Maverick had run a scam so tight he never imagined he'd be caught. Now it wss drifting out of his control, like a ball in the California surf.

Maverick needed a way to pull it back to shore—and fast.

–

Born on new year's day 1961 to an interracial couple, then adopted by a Black father and Native American
mother, Maverick Miles Nehemiah knew from a young age what it meant to stand out. He grew up on a
500-acre ranch in the tiny city of Tulia, 50 miles south of Amarillo, and spent much of his boyhood fixing tools
or tending to the horses and cattle that roamed the sprawling plot.

Maverick's mother was a schoolteacher and classical pianist who encouraged her only son to soak up the culture
of her Pueblo Indian tribe. She taught him about Little Bighorn, the Trail of Tears and—above all—never to
recite the Pledge of Allegiance or celebrate Thanksgiving. His father, a retired airman folks knew simply as The
Colonel, had narrowly avoided a Texas lynchmob in his own childhood. He respected his wife's views. But, he
reminded Maverick, "you're gonna be a Black man before you open your mouth."

Tulia was a racist town in a racist state. But everybody respected The Colonel—especially when he wore his Air
Force dress uniform, fresh-pressed and khaki as the day it was sewn. "Everybody would stand up and come to
attention," Maverick said. "It's a hell of a thing for a little kid to see."

Home life was similarly regimented. The Colonel forbade Maverick from speaking unless spoken to, and subject
his bedroom to military-style inspections. Two hours of study and a 40-minute piano lesson followed every
school day: the slightest hint of academic mediocrity, The Colonel warned, would ensure that Maverick would
lose out on college spots, jobs—anything—to a white kid. "B," he added, "is for Bullshit."

In 1977 The Colonel moved the family to Atlanta. It would offer Maverick opportunities Tulia never could, and
as the home of Martin Luther King Jr., Clinton Warner, Herman J. Russell and Romae Powell, it was a rare
American city whose political capital lay almost entirely in Black hands. The Colonel chose a lot in the city's
southwestern Peyton Road/Cascade Heights neighborhood, a "Golden Ghetto" of Black intelligentsia. He told
Maverick to stay away from politics. But it was *everywhere*: not least yards from their home where, just fifteen
years previous, white residents erected a "Berlin Wall", manned by gun-toting Klansmen, to keep Blacks out.

The wall came down months later but white families fled north of downtown, ensuring that, despite its
reputation, Atlanta remained a segregated city. Streets still carried the names of slaveowners and Confederate
panjandrums. Maverick looked them all up at his local library—and developed a deep admiration for General
Sherman. "Sherman came swooping down here like a fucking tempest," Maverick said, "and burned this whole
motherfucking place down." Neither wall nor hooden goons'd have stopped Sherman in his tracks. He'd have
blown right through them.

Maverick lasted just two weeks at Southwest High before authorities chose him at random to bus to Northside High School, a gilded institution nestled among the mansions of West Paces Ferry, home to Atlanta's white élite. Each day he and other Black kids caught the bus at 6am to make the 15-mile journey. Northside parents parked their vehicles in a gauntlet and glowered at the new arrivals. Tension hung like fog. "You could feel it," he said. "You could even tell teachers that didn't wanna teach you." The Confederacy's stars and bars still fluttered from a Northside flagpole, and Maverick marched to the principal's office to complain. The principal threw him out. The experience seared him like a brand.

"Black people are born into a world that's not for you," he said:

*'We don't want you here'*
*'You can't come in here'*
*'I don't want you to drink from this fountain'*
*'Can't use this bathroom'*

How come you don't want me? How come I can't drink?"

Busing forced Maverick to navigate another pair of wildly different worlds. But if Tulia had taught him anything, it was that nothing silenced bigots like a well-pressed uniform. Having been tasked by Northside to raise funds for a children's charity, Maverick donned an ROTC outfit and canvassed through West Paces Ferry. In one day he collected $5,000—$2,000 of which he kept as a "collector's fee."

Sport was another, even more potent, leveler. Maverick learned tennis, a game off-limits to most Black kids, and he was a menace on the football field—brobdingagian at six-foot-one and 235 pounds—crushing fellow 16-year-olds like Coke cans. Northfield's Tigers went on an unparalleled winning streak. The same parents who'd queued up at the school gate now cheered Maverick's name. So long as their team won, it would stay that way.

From then on, every training session, every oddjob Maverick had—from closing sales in a telemarketing boiler room, to teaching kids at a YMCA, and valeting cars at Atlanta's prestigious, white-only Cherokee Town and Country Club—became an opportunity to "pass" in white America, to learn the voices and mannerisms of a world he knew, deep down, wished he were somebody else. The Cherokee, a vast, colonnaded clubhouse frequented by Atlanta royalty like Ted Turner, allowed Maverick behind the wheels of Mercedes, Rolls Royces and Porsches for the first time. He was smitten—particularly by the newly-released Porsche 928. It was a "spaceship," he thought, light years ahead of its time.

But music, having grown up on a home diet of jazz and classical, was Maverick's first love. And when he graduated from Northside he traveled to Morgan State University in Baltimore to study telecommunications and broadcast journalism, hoping to become a radio DJ. Rock n' roll had given way to punk and new wave, and

funk greats like Chic and Steely Dan were hitting their stride. Maverick loved it all. In Atlanta all roads led to Buckhead, a northern suburb crammed full of high-end stores, restaurants and bars. But Maverick's greatest dream was to work in the heart of the music industry, in Los Angeles. To him the city represented everything Atlanta wasn't: liberalness, openmindedness, ocean, palm trees, beautiful women and, of course, the Raiders.

But in 1980, when Maverick was 19 years old, disaster struck when doctors diagnosed The Colonel with cancer. Maverick was struck by his father's refusal to bow to the disease—and his mother's unending dedication to her husband. When, months later, The Colonel died, Maverick was simply relieved "we didn't have to suffer any more."

Barely out of high school, Maverick was now executor of The Colonel's estate, including the U.S. savings bonds he would cash at banks up and down Atlanta. A couple years later, having completed his studies, Maverick found himself courted by professional football. Age 22 he joined a twice-daily training camp as a linebacker with the Houston Oilers in San Angelo, Texas. He wasn't like the other guys there: he was soft-spoken, college educated and not a little bit overawed.

"I'm looking at Earl Campbell and, you know, Ken Stabler," Maverick told me. "I'm like, these guys are my heroes. I'm ready to ask these guys for autographs." He would put a boombox on top of his locker and play fresh tunes before sessions—teammates called him "Disco"—but he didn't make the cut that year. "Maybe I wasn't gutsy enough," he says. "Maybe I wasn't just animal enough."

The following year Maverick joined the Indianapolis Colts, under the tutelage of legendary coach Rick Venturi. This time he dropped the college boy act, and rediscovered the Texas intensity from his teenage years. It was a brutal experience. "This is not just fun and games," he said. "You're a young athlete. You're going to take another grown man's job. This guy's got a house, a wife...And you are coming in as a rookie. You got to try and take this guy's job."

Maverick flew into bone-crunching tackles, made friends with stars like Johnny Cooks and Art Schlichter, and studied playbooks like they were his father's own will. Venturi warmed to him. But on the last day of camp, he told Maverick he'd narrowly missed out on that season's roster. "Rick Venturi, man, he really coached me up," Maverick told me. "He gave me every chance he could. He was the one that told me to turn my playbook in: 'Look here, man, if I could keep you I would. If I keep one more guy, you will be the guy.'"

But, Maverick added, "They got guys that were drafted they're gonna pay top money to, and they got grunts like me and they're just busting them up. It was just fodder, to be just chewed up."

The two camps had paid Maverick well, and he still had The Colonel's bonds. But his football dream was over, and he'd left the sport feeling like it was just another "modern-day plantation"—an extension of the same, racism system he'd experienced his entire life. "I saw things," he told me. "The same old shit all over again."

Maverick hung up his cleats for good, and took a vacation in Miami. Then he returned to Atlanta. He was burning with anger. He felt like Sherman. He wanted to burn the place down.

—

On February 1 1935, U.S. President Franklin D. Roosevelt signed legislation allowing his Treasury to sell a new kind of security: the savings bond. Americans would be offered a safe, accessible way to save, and Roosevelt's government would be given the financial boost it needed to borrow out of the Great Depression. A month later the Series A bond was issued with a purchase price of $18.75, with a face value of $25.

In May 1941 Roosevelt purchased the first Series E bond, which would raise just under $186 billion—almost $4tr today—for the nation's war effort. Bonds continued to play a key role in U.S. finance throughout the 20th century.

But few were as daedelus as the Bicentennial-design Series E, the first of which President Gerald Ford purchased in May 1975. A little larger than a $100 bill, the $25-value bond featured revolutionary scenes—battles, soldiers, famous leaders—surrounded by blue-and-white sunbeams beside the image of Philadelphia's Independence Hall, in which the Declaration of Independence was signed. The bond's U.S. Treasury seal and serial number were marked in red for added patriotic zest.

Maverick knew the Bicentennial well—since the age of 14 he'd negotiated some for his father in banks across Atlanta, and still had a few examples. Its intricacy thrilled him too, as did its rarity, having been discontinued only 18 months after its issue in December 1976. Each one took between 60 and 120 days to process.

The Colonel's savings and Maverick's NFL exploits had afforded him a level of financial security. He was even able to buy himself a Porsche 928S. But his football dream was in tatters—and he knew his wealth would soon dry. "I tried the honest way," he told me. "They didn't want me: not once, not twice. I gotta do something else now."

It was 1985. Heroin had long taken hold in American cities, and crack cocaine was devastating Black communities across the countries. Maverick didn't drink, and he didn't take drugs: the quickest buck, far as he saw it, was to get into narcotics smuggling. "Most people found their way into some type of criminal activity," he said. "A lot of people—especially disenfranchised people like black people. It became a very alluring thing."

But Maverick balked at anything that would harm the Black community. Then, a movie changed his life forever. One night that fall he visited a Buckhead picturehouse to watch William Friedkin's *To Live and Die in L.A.*, the neo-noir tale of Willem Defoe's deadly counterfeiter Rick Masters. It hooked him—Masters' artistry, his

attention to detail, the oozing color and mechanical precision of the printing press. He watched the movie 15 times, memorizing Masters' lines, and noting each element of his scam.

Counterfeiting wasn't like stealing hubcaps or selling drugs. It was a "whole different level," he said. But forging banknotes, like Masters? That would have put him into contact with organized criminals—and he didn't want any part of it. What he did want? To take money straight out of the hands of the U.S. government.

Maverick grabbed one of his old Bicentennial bonds. They would be the most difficult to replicate, a bewilderment of inks, plates and paper precise as a circuitboard, and graceful as fine art. But he believed he could pull it off—and besides, the irony of ripping off the Treasury with a physical celebration of its own grandiosity was too great to ignore. "200 years of Americans kicking ass, 200 years of slavery," he said. "It couldn't have been any more perfect and personal.

"It was special," he added. "I thought it was just apropos for what I was trying to do."

Just as he had done as a kid, Maverick spent days in the library poring over books on printing, bonds and banking. It soon became clear that above everything else he'd need—inks, plates, cutters, a printer—the paper would be the most important factor in passing his own bonds as the real deal. It was no ordinary stuff: alumina sheet, of a weight and thickness so precise that, if raised with suppliers, would immediately ring alarm bells.

Using the 'white' voice he'd honed in telesales, Maverick called dozens of mills around the world for samples, claiming to be an investment banker looking to print bearer bonds. Once in possession of the samples Maverick searched for a more sustainable, blackmarket supplier. At the time he was living part-time in L.A. and flipping exotic cars. A gym buddy suggested Leo, an underworld fixer and "high-level middleman", who cooked up deeds and titles for imported vehicles (Leo is not his real name).

The pair first met in Hollywood, and spoke only about vehicles. Maverick still wore cowboy boots, and used saddlebags as briefcases. "I never saw anything like that before," Leo told me. A month later Maverick pulled out one of The Colonel's Bicentennials. He spun the same story about bearer bonds—could Leo get him the paper? Leo's "mind boggled about what he was really gonna do with it," he told me. But getting the paper only took two weeks. Maverick and Leo never met in person again. "He had enough to roll forever," Leo said. "Once I dropped it off he was off to the races."

It was the only time Maverick's "caper," as he called it, had come into contact with a bona fide outlaw. To him, nothing was criminal unless he got caught—if anything, crises of the 1980s only steeled his determination to rob from the racist U.S. government.

The next steps were even tougher. First, Maverick begged the owner of a small, family-run printing firm in Atlanta named Tony to let him clean the shop floor. Tony specialized in wedding invitations, graduations and

business cards—groundfloor knowledge Maverick was desperate for. He'd make the place sparkle—putting in extra time to clean crockery or glasses—and bought subs or hotdogs out of his own pocket. Every so often he'd drop Tony a question: How does this work? How much does this part cost? What color's this? How many pounds per square inch pressure does this stamp take? "I thought on some level that I would be able to just literally through osmosis pick up what was needed," he told me.

"Boy, was I wrong. It was much more than that. Printing is very high level."

At the center of Tony's operation was a black, iron-framed Heidelberg press. First introduced in 1923 and the size of a tractor engine, the Heidelberg's genius lay in two suction-air arms: one lifted paper from the stock, while the other pulled printed sheets away to dry. Those arms lent it the nickname "The Windmill". But the Heidelberg seemed plucked from an altogether different era, hissing and clunking and whirring like some alien, steampunk doodad. Maverick loved it. A Heidelberg was the key to his caper, he realized. "A master printer can do anything."

But Maverick wasn't a master. After several months he persuaded Tony to let him use the Heidelberg alone, from midnight to 4.30am, to work on "personal projects"—he even paid Tony $500 each time. He began with business cards and DJ flyers. But soon he tried recreating the Bicentennial.

It was painstaking stuff. Some of the metallic inks needed hand-mixing, and getting the light blue of the Bicentennial's sun rays just right so it *beamed* out of the center of the bond, rather than merely streaked, took thousands of attempts. Each decal's infinitesimal detail, each serial number—everything had to be perfect.

It was like putting together a million-piece jigsaw with no picture, and no box: Maverick's own Rick Masters montage—only in ultra, ultra slow-motion. But he was thrilled. Getting the caper right was like football, running the same play countless times until it was unthinking, flawless. "You can't leap over all the stuff," he told me. "You gotta take it one step at a time."

After three months with Tony's Heidelberg, Maverick had printed $500,000 of Bicentennial bonds, which he stashed in a Tony Lama boot box. They weren't high quality. But hold it in your hand for any period of time and the oil on your skin would cause the blue inks to diffuse. The reds weren't quite the right shade of red, either.

Maverick was terrified he'd get busted with his mediocre work. He could hear the scolding words of his father—"B is for bullshit". But he was pretty sure the bonds would pass the look-test of a bank teller—moreso since the Bicentennial was such a rare, lesser-known security.

Besides, he was running out of money. And if he wanted to step up his caper, to perfect the work, he'd need something far better than midnight shifts at Tony's.

It was time for Maverick to walk the paper.

—

If Maverick's first batch of work felt amateur, he sure as hell wouldn't look it. One of his favorite tunes was ZZ Top's *Smart Dressed Man*: it was a mantra he'd been living by since childhood, when he witnessed the power of The Colonel's khaki Air Force uniform. Now, on a sunny morning in 1986, sat at the wheel of his Porsche 928S in the lot of a Citizens and Southern National (C&S) Bank branch in Peachtree Battle Mall, Buckhead, he knew that his look was as crucial to the success of his scam as the stack of bonds in his hand.

The Colonel had already bequeathed Maverick a Rolex watch. "It meant something to people in the know," he told me. "They figured, well, why this guy's got on a $40,000 watch, you know, he must be having some shit together." He paired it with a burgundy and gray-striped YSL suit and a slick white shirt. Only Maverick's shoes, a simple loafers, weren't quite up to standard.

He wasn't nervous. A scared man can't make money, he believed, and he looked like a broker, a businessman—even one of the bank's own managers. The only way a teller would suspect he was a conman was if *he* slipped up. And he'd been planning this moment for months. The stack he held totaled $9,998: ten grand would have triggered an automatic currency transaction report, or CTR. Then he exited the Porsche and walked right through the bank's front door.

The whole process took no longer than ten minutes—no questions, no qualms. Maverick left the bank with his money, walked calmly back to the Porsche and placed it in the car's cargo hole, beside the spare tire. He felt an overwhelming sense of relief. But above all, he told me, "It was so easy."

Maverick drove across town to the Hickory House BBQ, bought his mother her favorite stew, and delivered it to her. The next day he snuck into her room and placed $5,000 in an envelope on her nightstand.

He took the next week off to decompress, and print more work at Tony's shop. Then, in a single day, he hit banks all over Atlanta. First he hit three banks in Midtown. Then he drove to a nearby SunTrust and took it for another $9,998. Then he headed north to Buckhead for a burger near his old high school. He looked across the street: another C&S, and beside that, another SunTrust. He hit them both. Then he merged onto Highway 41 and discovered another pair of the same banks. He walked the paper in them too. By the time he reached his mother's home that evening, and she asked him why he was dressed so smartly, he had walked over $100,000 of counterfeit bonds in banks up and down Atlanta.

Within days he was back on the road, walking paper in Chattanooga, Dothan, Mobile. He'd pick a city, fill up on gas and begin at 9am, cruising and casing which banks looked best to hit—he called them "money houses". The company didn't matter, but the tellers did: He would always make a point of asking them how they were. If they

ignored him, it was a sign to be extra cautious. Everything went on first impressions—Maverick reckoned he could build a personal relationship with a teller in two minutes.

The second they stamped the contract, the walk was done: they had to pay. A good job would be over in five minutes; one that took a little more conversation might take 15. He'd try to be done by 3pm. And he never, ever hit the same spot twice—that was "an automatic bust," he told me. If he could get back to Atlanta, he would. If not he found the closest four- or five-star hotel, and stayed there.

After four months, and several more shifts at the helm of Tony's Heidelberg, Maverick had made around a million dollars. By his calculation, he could work two hours each day and take $100,000 while barely breaking sweat. He felt like Sherman, sweeping across the south and looting the Treasury—and he was getting rich.

Maverick set himself a goal of $50m before he'd go straight. But that was a lot of paper—just one suspicious teller and the whole caper could come crashing down. He needed to finesse his work.

Maverick left L.A., and rented a warehouse in Mechanicsville—a deprived, industrial and majority Black neighborhood south of downtown Atlanta. It was perfect: a redbrick former cotton store that backed onto the booming Southern Railroad freight line. It even had a loftspace he could gussy up. Maverick told the owner he was starting his own print business, and spent the lion's share of his inheritance and car money, $136,000 (almost half a million dollars today), on a Heidelberg of his own—he even tipped the UPS delivery guys $100 each to keep quiet.

Maverick had a girlfriend who lived a couple streets away. But he never told her what he did, or where he worked. He kept his profile in Atlanta to the bare minimum. His only vices were music like Miles Davis, Muddy Waters, Wang Chung—his Heidelberg theme was David Bowie's pop-rock anthem *Criminal World*—and the occasional hot chocolate, which he sipped at night, staring out from the warehouse's grubby roof at Atlanta's rapidly changing skyline. He got even cuter, finding a dye that could mimic the pattern of IBM key punch holes, and printed envelopes just like the ones sent by Treasury officials.

He never brought his mother to Mechanicsville—it was too rough—but the loft was enough to show her he was leading a prosperous life, working and building on his promising youth. It was his Batcave: a hideaway where he could become a superhero, printing and perfecting the toughest bond in the book. He was a whiz with industrial cutters, Exacto knives and magnifying glasses. He was a pro. It had taken Maverick three months to print his first $500,000 of flawed Bicentennials. Now he could knock off the same value in a week—and each one was close to perfect.

Maverick enjoyed his newfound fortune. He helped out family, fixing uncles' big rigs and backing the cash to expand a relative's bakery. He overtipped at restaurants and gave $20 bills to any homeless folks he saw. He bought a penthouse apartment on Peachtree Street, in Buckhead, a "crow's nest" populated by Atlanta's rich

and famous, with a bird's-eye view of downtown. Glamorous girlfriends came and went—none of whom knew about the caper.

He never once felt lonely. "The secret was safe with me," he said. "The moment I start talking and telling somebody what I'm doing, you open yourself up to jealousy, you're opening yourself up to scrutiny, you open up yourself to somebody telling you, 'I want to do that.'"

Rather, Maverick revelled in his newfound wealth, watching the money pile. He wasn't a drinker, or a gambler. But he loved to travel. He could hire a private jet from Atlanta's Charlie Brown Airport and head to L.A., the Caribbean—anywhere. His vinyl collection ballooned, and he was happy dropping a couple grand in his local record stores—Duran Duran, Blondie, Chic, The Clash, Bowie—and he bought VIP tickets to big shows by Depeche Mode and other huge acts across the U.S. "Music was 25 percent of this caper," he told me.

But no fortune could shield him from bigotry. People assumed Maverick was a drug dealer—it was the only way they could imagine a Black man would get rich. One time, having walked paper in Myrtle Beach, SC, a cop pulled Maverick over and claimed he'd found a bag of cocaine in the Porsche. Maverick pleaded with him—"Please don't do this to me. I work hard every day. I got a mom I gotta take care of. I never been involved with drugs in my life, man. I've never done any drugs. I don't even drink."

After several minutes, the cop let Maverick go. But he was shaken—and lucky he'd already walked the bonds. "I don't know if he was a racist, if he was just doing his job," he told me. "But I know he was a dirty cop, he was trying to put an ounce of cocaine on me...He's got the power. He's got the radio. He's got the guns, got the backup...It could happen at any moment."

Soon after, Maverick headed back to walk paper in Chattanooga. But something wasn't right. The teller wanted more documents, and he kept checking the Treasury details accompanying the bonds, eyeballing Maverick, and getting irate. Maverick shot back at the guy, and he processed the Bicentennials. One call to the cops, though, and Maverick knew he'd be looking at years—perhaps decades—behind bars.

"That's when I began to think," he told me, "I gotta see if I can find somebody that might join me." It was a huge risk. But Maverick knew that to make his $50m goal, he'd need to open the caper up. And if his life had taught him anything so far, it was that white people could do anything.

It was time to build the All-American Team.

—

Vanessa* was in a bind. She was tall and blonde, with knockout looks and dreams of becoming a model. But she'd moved to Atlanta with a boyfriend, and they broke up soon after—and by 1988, she was struggling to

make ends meet. Vanessa felt alone in her adopted hometown, and spent increasing amounts of time at an upscale Buckhead fitness center. But she was no gym bunny, and struggled to find a workout regime she loved.

Over time, Vanessa struck up a friendship with one of the gym's regulars. He was older than her, tall, built like an athlete—and his name, oddly, was Maverick. She'd never met anybody like him: Maverick was friendly and keen to help Vanessa with her fitness. But he was never creepy, and never once made a move on her. Like her he neither drank nor took drugs, and he was was well-spoken and worldly.

"We kind of hit it off really nice," Vanessa told me. "My whole goal was to be successful because I moved out of state, and I wanted to just do good and make money, buy a car, get nice clothes…I was young and ambitious."

"He was just the same," she added. Maverick had a keen eye for fashion, and helped Vanessa pick out clothes for casting calls and magazine shoots. She was feeling fitter than ever, and bagging shoots with national print titles. "He taught me how to dress a nice, sophisticated way, or a casual way," she told me. Vanessa felt she could trust Maverick with just about anything.

The first time he dropped the Bicentennials into conversation it was casual, "natural". Maverick had a bunch of Treasury bonds that needed negotiating at the bank, he told Vanessa—could she go do it for him? "I was like, 'No, I don't have time,'" she told me. "'Why?'"

Maverick didn't tell her about the caper. Eventually, though, Vanessa strolled into an Atlanta bank and negotiated the bonds. Maverick gave her a cut. Then he revealed that the bonds were counterfeits, and that there were others like her—five in total—who'd been walking the paper as she just had. Vanessa was stunned at first. But she'd done almost nothing, and she was thousands of dollars richer. She agreed to join, becoming the sixth member of Maverick's All-American Team.

Maverick had walked paper for almost two years alone. But the episodes in Myrtle Beach and Chattanooga had spooked him. He was still determined to hit his $50m goal before winding down the operation, though. Enlisting a team carried its own perils: jealousy, greed, and the constant fear of a leak. But it would decimate the time it took to reach that golden $50m. And besides, Maverick was beginning to realize that no matter which suit or Rolex he wore, which sports car he drove or how friendly and confident he was, to many in America's south he would always be considered a criminal because of his skin. "I could've put together nuclear-power, polished Black people," he told me. "But they're gonna get the same scrutiny as me.

"No, I gotta put together polished, all-American-type white folks."

In many ways, putting together an all-white team was the role Maverick had been born for. He'd spent his entire life maneuvering between Black, white and Native communities. He could pass on the phone as white, and he

knew what rich white folk wanted to hear. He'd seen firsthand the power of whiteness in America. Now he was going to harness it to take the U.S. government for millions.

Maverick met three of the team at the gym, including Vanessa. He played tennis with Jonathan* for months before he realized he had money trouble, and for Jay* the gym was a refuge from a life estranged from his family, and lonely in Atlanta.

Later in 1988 he met Ronald*—"Rugged Ronnie", Maverick called him, "hard as nails," a wisecracking roofer with the looks of a young Paul Newman. Ronnie had married his high-school sweetheart, and the couple had kids. He dreamed of flipping homes in Buckhead. But it was a closed shop, greased by generational wealth and maintained by old family friends. Ronnie needed cash. Maverick spied an opportunity.

All of the team needed money. Joyce* was an ex-cheerleader for the Atlanta Hawks. Maverick met her beside the Ritz-Carlton in Buckhead. But she'd cut ties with her rich, Florida family, and recently lost out on a position at Atlanta's Chamber of Commerce.

Then there was Delilah. Maverick met her at an Amoco in Vinings, on Atlanta's far northwestern edge, and they bonded over cars—his 928S; her '66 soft-top Corvette. Delilah told Maverick she wanted to trade in the Chevy for a Mercedes 560SL. But, like Vanessa and Jay she was lonely in Atlanta, and she'd left a five-month-old daughter with her mother in Springfield, Il. Delilah had big aspirations, money trouble and family problems. Maverick thought she'd be perfect.

Ronnie was the first to be inducted. Maverick drove the pair to an Atlanta bank, and walked the paper while Ronnie sat in the Porsche. Ten minutes later he returned, and threw the $9,998 into Ronnie's lap.

Ronnie was shocked. "What did you do?"

Maverick told him he'd simply negotiated some bonds—not that they were counterfeit. Then he told Ronnie to keep the cash. Ten minutes, ten thousand dollars. Ronnie was hooked. They all were: nobody walked away after that first hit.

But as much as Maverick believed his all-white team could get away with anything, they didn't just need to know the game. They needed to *look* it. Over the course of a fortnight, Maverick took each member to Buckhead's branch of Neiman Marcus, and decked them out in bespoke clothing—Brookes Brothers suits and Johnston Murphy loafers for the men, Donna Karan, Chanel and St. John for the women—five-figure watches and sparkling jewelry.

"These are no bullshit suits," he told me. "These are $1,200 dollar suits. Person will put that stuff on and feel a new sense of self. This is what I was trying to do. Stick with me, man. We're gonna come up together. I got a

plan for you. I see your potential and I want to invest my money into you. It's not your money. I'm willing to invest in you. Why would I do that? I'd have to believe in you."

Maverick taught the team how to walk and talk confidently, and how to gauge a teller's mood, inspecting them as The Colonel once had him.

Only then did he tell them the bonds were counterfeit.

"I was able to apply what I knew from sports, what I knew from being on a team," he told me. "I would always say, look, if I can do it, man, you absolutely can do."

"What do you mean I can do anything," they'd ask him. Some questioned whether they were up to the task.

"You can do anything you want," he shot back. "Nobody's gonna stop you."

"I would help them understand the power of their whiteness...Nobody's bothered you in your whole life. Everything is just gonna go as planned."

Maverick would educate his six aspirants on race—"about the climate here in the south. I'll talk to them about how unique they were." Sometimes he took them on "field trips" to Black neighborhoods in Atlanta they'd never seen before. "Clearly, I trust you to even be talking about this with you: just this conversation is a conspiracy. And you could go down in the federal building, report me right now. But that's how much trust I have.

"You're creating an environment where a person doesn't want to let you down," he added.

The next step was to roll-reverse, and Maverick would wait in the Porsche while the teammember walked the paper. Everybody did it flawlessly. After around four months, Maverick had his All-American Team, groomed and ready to walk his paper. "Now I have a mini army," he told me. "We can go out and burn this place down like Sherman did."

Then they began. Maverick would contact each team member by phone—perhaps one, perhaps all of them—and they'd travel to a city, hitting every money house in town from 9am til latest 3pm. Some pulled it off in two hours, others more. Oftentimes tellers didn't even ask for the women's IDs, they were so struck by their beauty.

But the minimum quota was ten per member. Each day, an All-American would take home just shy of $100,000, with their share $25,000. If the city was close enough to Atlanta they might drive home. If it were farther afield they'd get rooms at the swankiest hotel in town, and eat at the best steakhouse. Maverick would lay the day's

earnings out for the whole team to see, and run them through a money counter that took up to $12,500 a hit. The way it purred as it churned through the riches he'd stolen from Uncle Sam: it's the sound he misses most today.

In their first week together the team raked in almost $3m. He made sure there was no discernable pattern to the locations the team hit: he wanted them on their toes, ready to travel at any moment—with him at the helm. "He was the director and we were the actors," Vanessa told me.

The All-Americans knew they were committing larceny. But money talked. A day's take might be enough for the downpayment on a house, or an upscale vehicle. But, Maverick warned, they could never talk about the caper—to anybody. "Don't do it," he told them. "It'll be the end of the whole thing if you do."

To help ensure they kept quiet, Maverick gave top performers bonuses—cash, watches, jewelry and other luxury goods. He also took the team on spontaneous, luxury holidays to Brazil, Virgin Gorda BVI, Martinique and Bora Bora. "I never told them we were going," he told me—"just be ready to travel. Pack five or six days of clothes." At first the guys wanted to hook up with the girls. But soon, Maverick says, they saw the value of the team itself. Some saw themselves more as friends.

At one point Maverick believes he was spending around $20,000 a month on food and entertainment alone. And that didn't include the Houston penthouse, the Jeep CJ7 or Malibu mansion he spent more and more of his time at, away from Atlanta. It was the kind of home he'd dreamed of as a college kid: tranquil and secluded, right on the ocean. If he ever felt paranoid, Maverick would take one of his cars for a night drive on the empty, ocean highway. It was his favorite way to relax.

Every month or two, Maverick gathered the team in Houston or Atlanta. Their most common haunts were Varsity or the OK Café, a mom-and-pop joint near Buckhead that opened 24/7. Most times the team met in the dead of night. It was good to build trust—and for Maverick to gauge who of the six was doing well, or otherwise.

Over 18 months the All-American Team swept across the southeast: Birmingham, Montgomery, Mobile, Jacksonville, Tallahassee, Charleston, Hilton Head, Kiawah Island, Columbia, Charlotte, Raleigh, High Point.

Maverick remembers a wild trip to Jacksonville, which as a Naval hub was chocked full of money houses. Members could walk paper in four or five banks without driving. Everybody was feeling great—and partied hard. By 1989 they'd begun branching out into the Midwest: next they'd hit the northeast, then across to the Pacific. But never California. "That's my hideout," Maverick told me. "That's my refuge."

In early 1989 Maverick was riding through Orange, TX with Vanessa in the 928S when a cop pulled them over, claiming he'd profiled them as drug smugglers. Maverick didn't have any bonds in the car—but it felt like Myrtle Beach all over again. By then, Vanessa had made it onto the cover of a major publication, and she had copies

piled on the backseat. Only having claimed Maverick was her bodyguard, and posing with cops for photos at the station, would they be freed.

It was a nervous moment—and proof if any were needed that Maverick would keep getting profiled no matter how well he did. But it also cemented the team's closeness. They were friends. The six All-Americans trusted Maverick to take the lead: it was always his call where they hit, and when. Only Delilah exhibited the ambition to take the caper further, asking for more work when Maverick wanted to lay low, or work on perfecting the bonds a little more. One time he'd scuttled an entire day because she was getting out of hand. Maverick grew concerned she was planning a solo caper. "She probably felt that she was smarter than me," he said. "She probably felt like, 'I don't need you to do this.'"

But Maverick had built his team from scratch—and he trusted them. As everybody amassed wealth beyond their dreams, he allowed some of the All-Americans to hold onto his Bicentennials. As he took the call from Delilah that fateful evening, in February 1989, he knew it was a mistake.

—

*You're only a criminal if you get caught.*

And yet—here Maverick was, at an upmarket spa in southern California, spilling everything about the caper to his bewildered girlfriend. She wanted him to get out on the road, go on the run. Perhaps, he wondered, Delilah hadn't been jammed up at all—perhaps he was being paranoid?

No, of course she had. She'd wanted more, and he'd given her the paper. She'd headed back up to Illinois, and walked it twice in the same bank. "She had been seduced and lured by the money," Maverick said. "She betrayed us. She had been trusted enough to hold some of the bonds. And what did she do? She went out there without the crew and tried to make some money for herself."

The phone call had bought him some time. But once the Feds got their teeth into Delilah, it was only a matter of time until she'd roll on him, the caper and the entire All-American Team. But if Maverick could get out in front of it, turn himself in, he might at least be able to save the other five members—perhaps even negotiate a sentence smaller than the decades he feared. He had leverage: authorities would be keen to know how he pulled this thing off—and the machinery with which he did it. "I'm the only one that has the arcane knowledge of the craft," he said. Delilah's "just a runner to the lieutenant. She didn't know anything."

Maverick took a beat. Surrendering meant giving everything up—the girlfriend, the cars, the homes, the vacations, his wealth. "I got freedom," he told me. "I got money, I got power. Traveling all around the world, man...The Four Seasons, the Ritz Carlton, high end hotels. 24-hour room service. This is the life I'm used to. And I'm about to give this up."

It wasn't an easy decision. He'd worked tirelessly for years to make the game happen, and he was proud of it. By his own estimation he'd made around $20m walking paper. Had Delilah stayed in line, he'd have made his $50m target at a canter. "But the jig was up. And in my mind, I don't know what Delilah is telling them."

Maverick took a night drive from Ojai Valley to Malibu. Two days later, he turned himself into authorities in L.A.

Federal agents interviewed Maverick for over a hundred hours, in a windowless room at L.A.'s Metropolitan Detention Center—oftentimes hooked up to a polygraph, sometimes until 1am. A Black counterfeiter, printing near-perfect Bicentennial bonds and walking them right through the front entrances of banks halfway across the contiguous United States? At first they didn't believe him. Then they were sure he had a Treasury insider. Then, when they asked him about the team, they assumed he was sleeping with the female members, brainwashing them—more racism.

Then, as they came around to the breadth and skill of Maverick's work, cops from Fort Wayne to Fort Worth wanted to charge him in their state. Agents reeled off possible sentences—40, 50 years. It was terrifying. They told him he was America's most prolific bank robber. But he'd never even carried a gun, and the tellers had handed over the cash without duress. Maverick was in a jam—but he never gave up the other members of the team. Instead, he called James Henderson.

Henderson was a hotshot. For years he'd prosecuted top organized criminals for the U.S. government, before launching a private practice specializing in high-level white collar crime. Henderson laughed off the agents' bank robbery angle. "Robbery is forced," he told them. "And have you ever heard of a forced $20 million dollar bank robbery over a five-year span of time?"

Henderson gave the Feds a deal. They'd bundle up all of Maverick's charges in California, and prosecute him for securities fraud. In return he'd tell them everything about how he counterfeited the Bicentennials, and he'd give up everything in the Batcave—including his beloved Heidelberg. Imagine if Mafia groups got a hold of the caper, Henderson told them: Maverick's testimony could be worth hundreds of millions of dollars to the Treasury, if not billions.

But that was as far as Maverick's cooperation would go. He'd keep stumm on the paper, on Leo, Tony, and the five remaining members of the All-American Team. Nine months after they'd begun debriefing him, the authorities cautiously agreed to Henderson's terms, and set a date in court.

Seeing *The United States vs Maverick Miles Nehemiah* made Maverick's heart sink. He was nervous already, and he'd taken to brushing up on his Bible verse as his time in court approached. He still believed he'd stolen from a legitimate target. But he couldn't be arrogant, or cocky.

"They would always tell me how smart I was, how great I was," he said. "And then wait for me to say, yeah, I'm pretty smart.

"Now if I had taken that approach then—fuck, well—you think you're bad? You think you think you're a real pistol? Now everytime they would try to lay praise on me, I would just tell him I fucked up...My parents didn't raise me like this. I'm throwing away my whole future.

"And it wasn't an act," he added. "I don't know how much time they're going to cook up for me. But I know I'm going away. I'm going away from my momma. I'm going away from my beautiful girlfriend. I'm going away from the life that I had."

When he'd turned himself in months before, Maverick had been staring down the barrel of life behind bars. But in 1990, an L.A. court sentenced him to five years in federal prison. Henderson's gamble had paid off. And besides Delilah, who copped an even longer term, the All-American Team were free to continue with their lives. Ronnie bought his Buckhead home, and Vanessa flourished as an internationally-renowned glamor model.

Maverick's case was sealed in the interests of banking security. As of December 31, 2011 it's no longer possible to acquire paper U.S. savings bonds. "Savings bonds are very much a part of this country's history and culture and will remain a part of America's future," said public debt commissioner Van Zeck—"but in electronic form It's time for us to take a 1935 model and make it a 21st century investment tool."

Maverick served his time as Federal Inmate #39748-019 alongside gangsters, murderers and rapists before entering parole in 1995. He got straight back into the car business, and owns a hangar full of classic and modified Porsches in downtown L.A. Age 62 he's lost a couple yards of speed. But he's still in impressive shape—and he never lets you into his vehicle's passenger seat without first holding the door open. Maverick never allowed his mother to visit him in prison, and it took a long time for her anger to subside. But the pair exchanged letters, and she would eventually send him hundreds of glossy magazines—he loved profile features, and hoped he might one day feature in one.

For years, he'd been hesitant to share the details of his past, criminal life. Then a couple things happened. First, the financial crash of 2008 proved how Wall Street CEOs and big banks were the true crooks screwing over regular Americans. Then he learned about two other master counterfeiters: Frank Abagnale and Frank Bourassa. Abagnale might have been played on screen by Leonardo Di Caprio, but the payroll checks he passed in the 1960s were child's play compared to Maverick's work. And Frank Bourassa didn't even make a dime before the cops had picked him up. Maverick had walked his bonds right into those criminal banks, and he'd walked out with $20m. He wanted somebody to know.

The death of George Floyd, and the subsequent Black Lives Matter movement also showed Maverick how little had changed since the days when Confederate flags flew from Atlanta school masts. "It's gonna be a few hundred years off before this thing changes," he told me. "The problem is bigger than me. It's bigger than anybody else...Maybe there's not as many physical roadblocks with actual gun toting maniacs...maybe it's more insidious."

Eventually, even Maverick's mother saw the skill and audacity in her son's caper. He does too. "I paid my debt to society," he said. "Would I do it again? No, I wouldn't do it again. Because I fucked my whole life up doing that.

"But at the time when I was doing it, I was glad to do it."